3-12-07-6-0, whoever crossed the FAA by Gary S. Mueller v. Sandra M. O'Heir, appellant by Raymond E. Stachnik. Mr. Mueller, good afternoon. Oh, I got you on the wrong side, sorry. Mr. Stachnik. I should have another cup of coffee. That's okay. May it please the Court? It does. My name is Ray Stachnik. I represent Sandra O'Heir and Gary Penrith. Mrs. O'Heir is the executor of the estate of Richard O'Heir, her deceased husband, and is also the co-trustee of a marital trust that her husband created. Mr. Penrith is also a co-trustee of that trust. Mrs. O'Heir and Mr. Penrith respectfully ask this Court to reverse two trial court decisions in this case, one of which granted summary judgment in favor of George Harris and against Mrs. O'Heir and Mr. Penrith, and denied the O'Heir-Penrith cross-motion for summary judgment. The second point of relief that we're asking for is for this Court to reverse an award of money damages on the accounting claim that was tried subsequent to the resolution at the trial court level of the summary judgment motions. This case is about the trial court's erroneous acceptance of revisionist history pertaining to an easement on property located on Route 30 near the intersection of Harlem Avenue and Frankfort in Will County. It also is about the Court's misapplication of what I believe, as we point out in the brief, to be controlling precedent with respect to the defenses to the accounting claim. And finally, it is about the trial court's findings of fact at the conclusion of the trial on the accounting claim that I don't feel were supported by the evidence. The easement in question here was first recorded on August 28, 2001, and as we argue in the brief here today, it is our position that that easement benefited then and continues to benefit the property now owned by the O'Heir Marital Trust. And that property is immediately to the west of the George Sarris property, fronting on Route 30 in Frankfort. We also believe that the dissolution and accounting claims asserted by Mr. Sarris here were time-burdened. And finally, with respect to the affirmative defenses, the dissolution and accounting claims asserted by Mr. Sarris are precluded by the race judicata doctrine. With respect to the first point, the easement and the benefit of the easement, if the Court looks at what's attached as Appendix Tab 6, that is the recorded easement, and in particular Exhibit D attached to that easement is a legal description of the cross-access easement. That cross-access easement, according to the legal description in the document recorded in August of 2001, runs 543.39 feet from east to west. And there is a survey, as mentioned in the record, prepared by a surveyor by the name of Rogina, that confirms that the easement in fact ran 543.39 feet east to west and crossed by a couple of inches the boundary line between the Sarris and O'Hare property. And then if you look also at Appendix Tab 6, the recorded easement, on page 2, there is an easement reservation, as it says there, for the benefit of the adjoining property to the west. And I don't think there's any dispute by anybody here that the adjoining property to the west is what's known as the O'Hare property. Those facts, as contained in the recorded easement, were countered on summary judgment by Mr. Sarris and a surveyor that he hired by the name of David Tyson, who in affidavits, depositions, said that George Sarris never had any intent to extend the easement to the benefit of the O'Hare property. That testimony about Mr. Sarris's intent, I believe, is countered by what happened approximately seven years after the original easement was recorded. After this lawsuit was filed, after it was pending, and after Mrs. O'Hare's declaratory judgment claim regarding the extent of the benefit of the easement was pending, after all that happened, Mr. Sarris prevailed on Mr. Tyson to do a new plan of easement. And now the east-west dimension seven years after the fact was 542.39 feet, moving it one foot to the east and off the O'Hare property line. That's the revisionist history that I'm talking about here. This court, the third district, addressed easement issues in a decision several years ago, the Coomer case. And in that case, the third district, it slips my mind right now which justice, the opinion of Justice Aloi, I believe, I think Justice Stoddard was on the opinion also, said that in order to ascertain the intention of the parties to an easement, the court should consider the words in the easement and the circumstances contemporaneous to the transaction. Again, if you consider the words in the easement, the legal description runs 543.39 feet and it crosses the property line. If you consider the reservation in paragraph two that I mentioned, there is a reservation for the benefit of the adjoining property to the west. Back in 2008, back in 2001 when Mr. Sarris reported this easement, originally, I believe that he thought that he had a right of first refusal to this property. This is the third time before this court in variations of this case. In the second case, this court dealt with Mr. Sarris' claim right of first refusal, and that's mentioned in the brief. He believed that he had the right of first refusal to purchase what's known as the O'Hare property. He believed that in 2004 when he filed what I referred to as Sarris 2. I think he believed it in 2001 when he reported the original easement and ran it to the property line that he thought he had a right of first refusal. The second point deals with the statute of limitations. And the case that was the focal point of the statute of limitations defense on summary judgment was the Kravchina case, first district case that Judge Mason looked at and decided on considering that case that a 10-year statute of limitations was applicable here because there was a written partnership agreement. I believe if the court looks at Kravchina, as particularly as cited in the brief, the court will determine that Judge Mason respectfully misapplied Kravchina. Kravchina specifically said that accounting claims are subject to a five-year statute of limitations because it is in the catch-all in 13-205 of the codicil procedure. Anything not covered specifically has a five-year limitations period, including accounting cases. So says Kravchina, and so says Schlatzberg, which is also cited in the brief. And according to Kravchina, an accounting claim triggers absent an agreement to the contrary on dissolution of the partnership. Here, according to the terms of the partnership agreement, particularly paragraph 16, and the partnership agreement likewise is attached as an exhibit to the appendix, here an accounting was to occur on termination of the partnership. Termination, not on dissolution, termination, a difference. In August of 2000, when Mr. Sarris filed his first case, he filed a pleading that said under oath, and I quote, all the property has been sold or divided and a final accounting needs to be taken. He said that under oath in 2000 in Sarris 1, and again in an amended pleading in 2002 in Sarris 1. That was the trigger. And he admitted, and he admitted under oath, that the accounting was right going all the way back to 2000. Thus, if you take a five-year limitation period from that date at the latest, 2005 is the last time you could have brought this accounting claim. Instead, he brought it several years later in this case. Because he brought it initially, and that's my next point on the res judicata. He asked for a dissolution on accounting in Sarris 1, but voluntarily dismissed those claims without a resolution, didn't revive them in Sarris 2, and then states them again in this case, the case before the court. I've already been wrong, but isn't he, isn't this latest accounting action dealing with the winding up subsequent to the last one? Judge, this accounting action, Your Honor, this accounting action goes back and covers work for excavation, excavation work done in 1988. That's how far it goes back. He's not asking for that now, is he? That was part of the award that was given to him in trial, going back to excavation work going back to 1988, okay? And so that's why we say the limitations period applies. Likewise, it puts in the res judicata. Our Supreme Court in Ryan v. Noyce teaches that claim splitting is prohibited, and that's precisely what occurred here. He filed the claim in 2000, abandoned it for whatever reason, didn't revive it when he filed the second case, and revives it again. If you look at the facts in this case on how that was done vis-a-vis Ryan, Ryan puts to this case almost exactly, and it involves prohibited claim splitting. That was another basis of the defense. Finally, with respect to the evidence at trial on the accounting case. Can you explain your theory of splitting? Pardon me, Your Honor? Can you explain your theory of splitting, how this was claim splitting? He files a claim for accounting in 2000, in Saris 1. And voluntarily dismisses it. Voluntarily dismisses it. Okay, doesn't get a resolution. And then didn't file it. Didn't file it in Saris 2, and refiles it in this case. Okay? The same claim. Okay? This is winding up everything, though. But according to what he said under oath, okay, in the pleadings filed in Saris 1, everything was wound up. Again, he said, he said, all the property has been sold and divided, or divided, and a final accounting needs to be taken. That's in Saris 1. That's in Saris 1. What are you reading from? That is from the pleading that he filed, the complaint that he filed, amended complaint that he filed in Saris 1. And if I can give you a record reference here, that is at RC 1260 through 1267. And that was the thing that was voluntarily dismissed? Correct. And there was never a? There was never an adjudication. But again, according to Ryan, okay, race judicata covers not only claims that are fully resolved, but claims that could have been resolved in the original proceeding. Clearly, that wasn't. Well, when they say could have been resolved in the original proceeding, that's in anticipation of something that was resolved in part. I don't believe, Your Honor, with all due respect, I don't think Ryan says that. I think Ryan says that if it had a possibility of being resolved, but wasn't, race judicata still applies, and then the claim-splitting doctrine that we rely on here kicks in. That's what I believe Ryan says. Pardon me? Why isn't that a judicial admission? Pardon me? Why isn't that statement a judicial admission? I believe it was, and that's what I characterized it as, that it was a judicial admission. And it cemented, it cemented those admissions under oath in Saris 1, cement the basis for race judicata and the statute of limitations. It shows when the cause of action approved and when it could have been resolved back in 2000. But there's a distinction between rebuttable and irrebuttable admissions. Well, judicial admissions, I don't know. I don't know that a judicial admission, Your Honor, necessarily is rebuttable.  Well, a certain pleading can be rebuttable. That's correct. But these pleadings were both under oath going back to 2000. If I can briefly finish with the trial evidence, the award at the trial of the accounting claim originally was $35,461 and some change. It was revised downward a couple weeks later to $34,000. The court made an adjustment in the final order. The components of that were attorney's fees incurred by Mr. Saris, some taxes, and this excavation claim going back to 1988. And if you look at the trial evidence that's discussed in the brief, the partnership agreement said you could only recover attorney's fees for liquidation work. There's fees that were awarded that had nothing to do with liquidation work. It also said that all the legal work under the partnership agreement was to be done by a particular law firm. So it said the partnership agreement was never amended. The work wasn't done by that law firm. It was done by counsel here. With respect to the real estate taxes, the trial court found in its ruling that, very quickly here, that the summary that Mr. Saris relied on was unreliable and inaccurate. And it also found an inconsistency in his testimony. As I say in the brief, I don't think it was an inconsistency. I think he was impeached. Nonetheless, the trial court still made an award on that portion of the damages claim with respect to the accounting. Finally, we deal with the excavation work going back to 1988, okay, that was never resolved when Mr. O'Hare was alive for all those years. He died in 2006 while his partner was alive. Never resolved. And if you look at the evidence, the bills on that, the court awarded Mr. Saris something like $17,500 based on a statement for the work dated May 19th of 1988. There was written documentary evidence submitted by us at trial that shows that Mr. Saris received payments far in excess of $17,500 for excavation work after May 19th, 1988. Again, that is the summary of the case, the best I can give you at this point, unless you have any questions. And for all of these reasons, we respectfully request that this court reverse the two decisions by the trial court in Will County. Thank you. Thank you very much. Were those judicial admissions? No, Your Honor, they are not. Then why not? They're not judicial admissions for a number of reasons, not the least of which is it was a statement within the complaint. It was pled by my client, by Mr. Saris. However, as Judge Mason mentioned in his July 19th order, he indicated that because the outlots had never been transferred out, any action prior to March 9th would have been untimely. So even if it was seen as a judicial admission, Judge Mason says it doesn't matter because it would have been untimely until those two outlots were transferred out. May I please report? Counsel. Mr. Saris. Obviously, we ask you to please affirm the actions of Judge Mason. Judge Mason took a great deal of time and effort in coming up with the two orders that he entered. The May 27th, 2011 order is 17 pages. The July 19th, 2012 order is 18 pages. We're here because there's an issue, at least a concern, concerning both the easement grant and then also the partnership dissolution accounting procedure, and then finally an award of damages, as Counselor Griffin pointed out the number. Most importantly, what I would ask you to please do, what I'm going to do today, try to do today, is to go through the easement grant itself, go through some of the case law which supports our position, and some of the evidence and testimony that was presented through the most presumptive judgment. Same way with the partnership dissolution accounting procedure, to actually look at the document and then to go through some of the testimony that was presented in the case law that supports our case. I think after you do that, you will find that the judgment and awards by Judge Mason should be affirmed. The easement grant. First and foremost, when you look at that, the front cover on the first page lists parcels 1, 2, and 3. My client owns parcel 3. The other two parcels are owned by someone else. They are not owned by Mr. O'Hare. There is a provision, paragraph, there's a pin number that's included within the easement grant. It does not include property owned by Mr. O'Hare. Page 2 has an easement agreement on top. It talks about parcels 1, 2, and 3 again. It also has lettered paragraphs, A, B, C, and D. A, B, and C refer to the three parties to the easement grant. My client and two other people, and certainly not Mr. O'Hare or anybody on his side of the ledger. Subparagraph D as in dog says the following. It says that the three parties to the easement wish to grant and receive easements over, under, and across parcel 1, parcel 2, and parcel 3. No mention of the O'Hare property. There's consideration provided by each one of the parties to the agreement, not by Mr. O'Hare. There's paragraph 1 talks about the easement of the ingress and egress. It discusses which parties to construct a road, a driveway, an entranceway, who is supposed to be responsible for snow removal. I direct your honors to that provision. Once again, Mr. O'Hare has not discussed it at any point in time during that. Also, please remember Mr. O'Hare is alive at this time. He was alive and could have taken part in this and did not. I'll simply hit the high point in paragraphs where I go through every single one of them. Paragraph 5 talks about the use of the easement areas. It says it's by and between the parties to this easement. There is no mention of the O'Hare property, no mention of Mr. O'Hare. Paragraph 8 says that all the benefits run with the property. They extend to the heirs, assigned successors, and others of the parties to the agreement, not to Mr. O'Hare. Paragraph 10 says in the construction paragraph, the rule of strict construction does not apply here. The grant shall be given reasonable construction so that the intention of the parties is carried out. The intention of the parties, not Mr. O'Hare. This document is signed. It's signed by the three people who actually are parties to the agreement, not Mr. O'Hare. Exhibits A, B, and C provide legal descriptions for the parties who are part of the agreement. Exhibit C actually has a legal description for my client's property. It specifically says and excludes the West 540 feet. Everyone understands and agrees that the West 540 feet is Mr. O'Hare's property. It says specifically, we exclude that parcel. So, with that in mind, what else do we have? We have a case law that supports this as well. As counsel tried to allude or suggested, the Coomer case, in that case, this very court overturned a motion for summary judgment originally found in favor of the defendant. There, this court considered the applicability and enforceability of a written easement and noted that the easement is a contract and, as such, must include all formal requirements of a deed. The court considered the intention of the parties as determined by the circumstances contemporaneous to the transaction. Further, those same dictates were mentioned in McMahon v. Hines. In Pacemaker and Sullivan v. Bagby, the same basic tenets are included, saying that you have to take into account the intention of the parties. That's why I went through my painstaking explanation of the easement agreement. Mr. O'Hare, I would challenge you to find the name O'Hare or the marital trust as defined and explained in the actual caption of our case. You will not find them. He is not a party to that. You can't take advantage of that. You're not a party to it. Even if this court would determine and follow and suggest that counsel's suggestions about the one provision within Exhibit D that says it may go to the benefit of the party or the property west of my client's property, and even if you were to find it persuasive that they did get a surveyor who went out and moved five legends almost a quarter mile away from this property to come up with hopefully two inches that it would suggest this easement went on to Mr. O'Hare's property, even if you find that those are persuasive and overturn or don't consider all of the other provisions that are in the easement grant, case law supports our position that, once again, the motion for summary judgment in favor of my client and against O'Hare is warranted. I direct your attention to Honduras' County of Kane. In that case, the court specifically said, it was decided in January of 2012, no one but the owner of land can create an easement over it. That makes sense. Imagine if I didn't like something that was done by anybody in the gallery here. I could find out where their house is. I could find out through Google and the Internet where they live, the legal description, and I could just go ahead and throw on an easement against their property that would cloud their title and affect their ownership. You can't do that, and there's a good reason why you can't do that. In Hond, it said, the instrument creating the easement must be construed in accordance with the intention of the parties, as ascertained by words of the instrument, circumstances contemporaneous to the transaction, the state of the thing conveyed, and the objectives to be obtained. Further, in Asher v. Zobrist, once again, the court there said, only an owner of land can create an easement over it. Only an owner of land. If any of the prior cases are at all relevant to this matter today, and I submit to you certainly not, but even if they are, the only relevance is that in what counsel has called Saris II, this court divided property that was in the trust. The property that was in the trust was what's now known as the Saris property and the O'Hare property. And this court said, it's even in one trust, but we're going to divide it. And in that order, it specifically said, you, Mr. Saris, you get rights and interest to the east side, you, Mr. O'Hare, you have rights and interest to the south and west side, and neither do the twin meet. You, Mr. Saris, have no right of first refusal to the south and the west, and you, Mr. O'Hare, have no rights on Mr. Saris' property. So clearly, my client, even if he wanted to put the easement on Mr. O'Hare's property, he cannot. He is stopped from being able to do that. Thus, we believe it is absolutely warranted that the motion for summary judgment was granted in favor of my client, Mr. O'Hare, and we would ask you to still do the same and affirm that action. The second portion is the partnership agreement. Once again, I ask you to start there because I think it's most instructive. Paragraph 1 says, specifically, the partnership is set up for owning, acquiring, leasing, investing in, managing, operating, and otherwise dealing with real property described. And in that, it has a legal scripture for the entire parcel, dealing with those things. Profits and losses are to be divided 50-50 after Mr. O'Hare was reimbursed or any reimbursable expenses. Transfers upon death, death of a partner shall have no effect on a continuation of the partnership, which is contrary, as all of you know, to what most partnerships will do. This one specifically said, no, it's going to build a lot. That was the first paragraph 9. The second paragraph 9 talks about the voluntary termination of the partnership. There, Judge Mason specifically said that it was because of the outlets and the outlets still being in the partnership and the fact that those outlets got transferred on March 9, 2011, that's the triggering event. You can't even wind down the partnership unless and until everything's up. That's when everything was up. And therefore, Judge Mason, if we think correctly, pointed out that that was the trigger event. Therefore, there are no other concerns for res judicatus, statute of limitations, or latches. Other major points are paragraph 15. Each partner hereby agrees that he has unlimited liability for the deaths of the partnership. And paragraph 16, upon the termination of the partnership, the accounting shall be taken by the managing partner. That's exactly what was done here. Though paragraph 23 talks about legal services and only being provided by the Phelan Egan firm, in the testimony that's in the record, Mr. Sarris testified without any type of refutation that that partnership had hired other law firms throughout the time to do zoning matters and other issues. So when the court asked about that, I was able to say, Judge, I'm not Phelan Egan. However, the partnership has acted before where they have hired someone outside. So are there cases that would support our cause of action and our argument? I submit to you absolutely there are. Curry v. Curry, which was cited in all of our briefs. The reason why we cite Curry v. Curry is because in that case the court made an award on partnership dissolution, an accounting case despite imprecise nature of plaintiff's proof, all doubts and obscurities created by the neglect or failure on the part to keep adequate records were found against that record keeper. Records were destroyed in that case by a son who had been ordered to preserve those. Judge Mason cited that. As you will see in the order, Judge Mason also indicated it was not absolutely perfect, the type of documentation that he had to review, but he felt based upon his review, the documentation in his review of the testimony of Mr. Sarris, his review of all the information that was available to him at the time, he still felt that he could make those determinations in the number of figures. Counsel, once again, cites the state of Coachella to suggest that the statute of limitations doesn't apply, that it's actually in that case. In that case what happened was the appellate court affirmed the dismissal of the plaintiff's claim against the defendants of state as barred by the statute of limitations.  The son passed away in 1981. The mother passed away in 1990. The widowed daughter-in-law sued in 1991 to try to see if there were any benefits to the partnership that she could latch onto. In that case the court barred the claim saying that you, widowed daughter-in-law, should have brought your case within five years of when your husband passed away because it was based on an oral partnership agreement. The case specifically identifies the fact it was an oral agreement. That's why Judge Mason felt that doesn't apply. And it doesn't apply here because, as I've already gone through, we have a written partnership agreement. In Rand and Noyce, counsel did cite that and suggest, once again, as we'll hear, I cited it to you simply to suggest to you. It does provide those parameters and issues that are needed to be proven for a res judicata in a foreign of defense. Res judicata prohibits a party from later seeking relief on the basis of the issues which might have been raised in a previous action. In that case, reign one, as they called it, the plaintiff dismissed his common law account and wanted to go forward on a rescission cause of action. Then he dismissed that case, came back in reign two, and tried to move forward on both cause of action. And the court said, hey, wait a minute, you can't do that. But in that case, it was very clear that those two causes of action were very right. Were ones that could be litigated. In our case, as Judge Mason stated, it would not have been right. It would not have been right until those outlaws were actually gotten rid of. Schlossberg versus Carrington, the key element there that I would ask you to consider is this. In that case, it says the prerequisite to dissolution is an actual existence at the time the dissolution is sought. In that case, the partnership ceased in 1965. There were no longer conducting business. There were no remnants of business. There was nothing that showed there was anything in the partnership. Then someone asked for an accounting in 1976. That's why the court said, hey, wait a minute, you can't have an accounting in 1976. There's nothing to account for. Here we do. We have an accounting. And there were things to account for. As we explained in the agreement, it says losses will be shared as well as profits. They were very overly optimistic, thought that everything would be a profit, but they did discuss losses. In this case, yes, there was a claim for excavation work. As you will see in the record, the original amount was $175,000. The amount that Mike Kleine was paid was $142,000. The difference is $33,000. That's where the math error was made. Originally, Judge Mason said it was $35,000. It really is $33,000. But that's why the judge said, clearly based upon the information that he had presented to him, Mike Kleine was owed $33,000. And he split it in half as per the agreement. Realizing that my time is short, the only other thing I want to mention is on the damages claim, the standard is against the manifesto. The evidence, counsel and appellate have shown absolutely no evidence or testimony to suggest what's wrong. In the order of July 19th, Judge Mason goes through out of the 18 pages, spends 10 pages going through. Every single one of those items that we requested, he didn't give my client everything he asked for. Why didn't we counter him? Because we felt that what he had done was absolutely reasonable, was absolutely appropriate. That's why we didn't counter appeal. He was correct. He went through clean staking and said, here's where the numbers come from. Here's why I'm going to give you this amount of money for real estate property taxes. This is why I'm going to give you money for Mr. Mueller's time, because after the time he gave us credit for was from the time those two outlaws were turned over until we were in court. He then took our fees, cut them in half, saying half the time was spent for Mr. Sarris individually, the other half was actually on a partnership dissolution, and then took one half again to then charge Mr. O'Hare for the half that he should be paying for. We would ask that you please affirm the orders in judgment of Judge Mason, the affirmative defenses of res judicata, essential limitations and laches. Counsel doesn't need to spend time today talking to you about laches. I would submit to you that there is case law out there that explains what you have to do for laches. That case is Moe v. Hergen, H-E-R-G-A-N. You have to show lack of diligence presenting a claim and prejudice to O'Hare because of the delay. That's not even attempted. We try to come up with those two requirements. So finally, we ask that you affirm the decisions of Judge Mason. Thank you. Thank you for your time. Last point first, if I may. Laches. As cited in the brief, we believe Schlossberg controls on the laches issue. Schlossberg found that where an action is combined both law and equity, and there is a controlling statute of limitations, in this case five years, as we argue, that determines the laches period as well. Schlossberg also says, in that instance, the party asserting the laches need not establish any prejudice. So says Schlossberg in that instance. We think that's exactly what happened here. And if you think about it, think about the delay in bringing claims related to excavation work back in 1988 and 20-some years later and the difficulty in defending such claims. I think the prejudice is apparent, even though it need not have been proven. With respect to Corey versus Corey, counsel says, well, the court found that there was no – that the managing partner, notwithstanding his faults, was exonerated. I think there's completely different facts here. I think this partnership agreement has specific requirements in it requiring Mr. Sarris as the managing partner to do certain things, which he clearly did not do. And you can see that from the records produced by him at the accounting trial. Corey says, the managing partner, who was admittedly responsible for virtually all financial aspects of the partnership, like Mr. Sarris, had a duty as trustee to maintain regular and accurate records and to account for partnership transactions. All doubts and obscurities created by his own negligent failure to keep adequate records were properly resolved against him by the trial court. That's the law in Illinois. So says the Supreme Court in Corey. There's another case that we cited in our brief that the court should be aware of called Hildebrand versus Topping, which cites Williams versus Hinkle, which is a – Williams is a case delivered by this district back in 1916. And Hildebrand, citing Williams, says, furthermore, one partner cannot maintain an action against his co-partners for an accounting as to particular items or transactions. That's exactly what Mr. Sarris did here. It's exactly against the teachings of Hinkle in this district and Hildebrand in the first district. The four cases that they cite regarding the ownership of property, they're distinguishing. They cite Schellenberger – or Shellbacker, I'm sorry, Waller, Asbisher, and Hahn. None of those four cases involved a reservation in the easement in favor of the party claiming the benefit, which is the reservation contained in this recorded easement. None of the cases even involved a cross-access easement. None of the cases involved a cross-access easement created by an individual who later attempted to retract the cross-access easement seven years after the fact. Unilateral. Each of the four cases involved an attempt to overreach the stated terms of the easement at issue. There's no such attempt here. This easement doesn't go over land owned by Mrs. O'Hara, so it doesn't create an issue. It goes to the property line and gives Mrs. O'Hara and the owner of that property access, cross-access, as is pointed out in the briefs. In our brief, the property to the east has full in-and-out, left-right, in-and-out access to Route 30. Mr. Sarris does, and with this cross-access easement, Mrs. O'Hara does as well, or the owner of that property does. Without it, it's a limited right-in, right-out, and according to the Illinois Department of Transportation, which is in the record in this case, that could only be placed at the far western end of the property because they wouldn't allow a full in-and-out that close to the one that's already in existence. So there is a benefit that Mrs. O'Hara or the owner of that property could get as a result of this, completely different than the overreach that was sought in the cases that they cite in support of this proposition that only an owner can create an easement. The last point in the Shellbacker case, this statement is made by the court talking about Mr. O'Hara being a party to the contract. It was decided in Goodwillie Co. v. Commonwealth Electric Co., 241 Illinois 42, an Illinois Supreme Court case, that an easement may be created in favor of one who is not a party to the contract for the easement. So, says the Illinois Supreme Court, that's cited in one of the cases that they cite in this brief in the Shellbacker case. The last point is the outlets. Mr. Sarris, and I'll be as quick as I can on this, Mr. Sarris in his plea back in Sarris 1, said under oath, again, this is in 2000, the only remaining partnership property was the frontage property, which was the subject matter of the plant unit development, and certain outlots, which will be transferred to the Village of Frankfurt. At the trial of the accounting claim, Mr. Sarris testified that by February of 1996, the three outlets had been pledged to the Village of Frankfurt under a pre-indexation agreement that predated the 1996 split up between these two individuals. The outlots were gone. They're using it as a convenient triggering point because they know that the accounting was triggered, as Mr. Sarris said, because everything was gone. Everything was gone. And, in effect, these outlots were gone as well. They were gone. They were pledged. There was an obligation to deliver them to the Village of Frankfurt. Mr. Cordray, is there any questions? I'm sorry for rushing through this. You both had to, and I appreciate your efforts. Now you can relax and breathe a little more slowly. Thank you. We'll be taking the matter under advisement, and I have a feeling we won't be rendering the decision in the next few days. Okay. We'll be contemplating it carefully. For now, we're going to take a recess for a panel. Appreciate it. Thank you very much.